**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SCOTTY G., Plaintiff, | ) | |
| v. | ) | 1:25CV501 |
| FRANK J. BISIGNANO, Commissioner of Social Security, Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Scotty G., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 4 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 7 (Plaintiff's Brief); Docket Entry 10 (Commissioner's Brief)). For the reasons that follow, the Court will enter judgment for the Commissioner.[1]

[1] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge [] to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein." (Docket Entry 11 at 1.)

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 214-20), alleging a disability onset date of August 20, 2022 (see Tr. 214, 217). Upon denial of that application initially (Tr. 94-104, 124-33) and on reconsideration (Tr. 105-16, 136-43), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 144-45). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 47-82.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 19-45.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 5-11, 211-13, 360-61), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2026.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since August 20, 2022, the alleged onset date.
>
> . . .
>
> 3. [Plaintiff] has the following severe impairments: borderline personality disorder; unspecified anxiety disorder; depression; obesity; lumbar annular fissure; and borderline intellectual functioning.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

> . . .
>
> 5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except [he] can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, and crouch but he can never crawl. [He] should not work in extreme cold or with vibration. He is able to perform simple, routine, and repetitive tasks. He is able to make simple work-related decisions. He is able to occasionally interact with coworkers but should have no more than incidental interaction with the public. He is able to tolerate few changes in a routine work setting.
>
> . . .
>
> 6. [Plaintiff] is unable to perform any past relevant work.
>
> . . .
>
> 10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.
>
> . . .
>
> 11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from August 20, 2022, through the date of th[e ALJ's] decision.

(Tr. 24-39 (bold font and internal parenthetical citations omitted).)

## **II. DISCUSSION**

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited."

Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## **A. Standard of Review**

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as

adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')]

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not,

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant]

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

**B. Assignments of Error**

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "the [RFC] assessment is not supported by substantial evidence where the ALJ failed to perform an explicit analysis of [] Plaintiff's subjective testimony" (Docket Entry 7 at 7 (bold font, all-caps font, and block formatting omitted)); and

2) "the ALJ committed harmful legal error where she rejected the medical opinions regarding Plaintiff's mental health based on his lack of aggressive treatment but failed to consider the impact of his financial limitations and mental illness on his ability to pursue specialist care" (id. at 14 (bold font, all-caps font, and block formatting omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 10 at 4-22.)

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

### 1. Plaintiff's Subjective Symptom Reports

Plaintiff's first assignment of error maintains that "the [RFC] assessment is not supported by substantial evidence where the ALJ failed to perform an explicit analysis of [] Plaintiff's subjective testimony." (Docket Entry 7 at 7 (bold font, all-caps font, and block formatting omitted).) In particular, Plaintiff emphasizes that, although "[t]he ALJ made vague references to the objective medical evidence, and made a rote recitation of the evidence," the ALJ "did not perform an actual analysis explaining why [] Plaintiff's testimony concerning his pain and mental health symptoms was not credible and what evidence contradicted his testimony." (Id. at 10.) According to Plaintiff, "[t]he medical evidence of record substantially corroborates Plaintiff's subjective complaints regarding his physical limitations with standing, walking, and carrying" (id. at 11; see also id. (describing such supporting medical evidence (citing Tr. 485, 488, 504, 519, 794))), as well as his "testimony regarding his severe mental health symptoms, including depression, paranoid thoughts, and sleep disturbances" (id. at 12; see also id. (summarizing evidence supporting Plaintiff's testimony (citing Tr. 366, 372, 417, 420, 473, 476, 487, 491, 494, 761, 775, 777, 780, 784))). Plaintiff further argues that "the ALJ [] ignored the contrary evidence that supports Plaintiff's testimony." (Id. at 13 (citing Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir.

2020), for proposition that "ALJ may not engage in improper selective evaluation of the record").) For the reasons that follow, those contentions lack merit.

The Commissioner's regulations adopt a two-part test for evaluating a claimant's statements about symptoms. See 20 C.F.R. § 404.1529; see also Social Security Ruling 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *3 (Oct. 25, 2017) ("SSR 16-3p"). First, the ALJ must determine whether a claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [the claimant]'s symptoms, such as pain." 20 C.F.R. § 404.1529(b); see also SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source" to establish the existence of a medically determinable impairment "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); see also SSR 16-3p, 2017 WL 5180304, at *3. "Objective medical evidence" consists of medical "[s]igns" ("anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements" and that "must be shown by medically acceptable clinical diagnostic techniques," 20 C.F.R. § 404.1502(g)) and "[l]aboratory findings" ("anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," 20 C.F.R.

§ 404.1502(c)). <u>See</u> 20 C.F.R. § 404.1502(f); <u>see also</u> SSR 16-3p, 2017 WL 5180304, at *3.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of "the intensity and persistence of [the claimant's] symptoms," as well as "the extent to which [those] symptoms limit [his or her] capacity for work." 20 C.F.R. § 404.1529(c); <u>see also</u> SSR 16-3p, 2017 WL 5180304, at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4. Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

> 1. [ D]aily activities;
>
> 2. The location, duration, frequency, and intensity of [] pain or other symptoms;
>
> 3. Precipitating and aggravating factors;
>
> 4. The type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms;
>
> 5. Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms;

> 6. Any measures [a claimant] use[s] or ha[s] used to relieve [] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, or sleeping on a board, etc.); and
>
> 7. Any other factors concerning [a claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); see also SSR 16-3p, 2017 WL 5180304, at *7-8. The ALJ cannot "reject [a claimant's] statements about the intensity and persistence of pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2) (emphasis added); see also SSR 16-3p, 2017 WL 5180304, at *5.

In this case, the ALJ expressly acknowledged Plaintiff's testimony and statements about his physical and mental symptoms in considerable detail:

> During the hearing, [Plaintiff] stated that he did not drive, do housework, or shop. He testified that he used a single point cane to walk. He stated that he could sit for about 10 minutes and walk for about 5 minutes at one time. He stated that he could stand for about 30 minutes at one time . . . and could not lift a gallon of milk or a two-liter bottle of soda. He stated that he a [sic] cane for the last six months. He testified that he was hit in the head while at work and after his injury, he had anxiety, depression and saw things that were not there. He stated that he was treated for suicidal ideation. [He] stated that his wife took him to the doctor and if she did not take him, he would not go. He stated that he still felt suicidal and when he was really depressed, he stayed in bed. He stated that he took naps during the daytime and only slept about 2-3 hours a

> night. He stated that he was unstable on his feet and sometimes fell. He testified that he needed help bathing and getting on his feet. He stated that he saw things that were not there about once a month. He stated that he always felt like people were out to get him. He stated that he shot himself in 2019 or 2020 during a suicide attempt and still had a bullet lodged in his shoulder. Elsewhere, [he] reported that he did not feel safe going outside.

(Tr. 28 (internal parenthetical citation omitted).) The ALJ thereafter proceeded to find, at part one of the subjective symptom analysis, that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but then determined, at part two, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Id.) After discussing the medical evidence of record (see Tr. 29-34), the ALJ concluded that "[s]uch findings relative to [Plaintiff]'s physical and mental impairments support[ed] a limitation to the range of light work found [in the RFC assessment,]" but that "greater limitations [we]re not warranted by the generally normal review of his psychiatric and musculoskeletal systems, the general normal mental and motor exam findings, []his history of non-compliance and the routine and conservative treatment he received" (Tr. 34-35 (internal parenthetical citation omitted)).

Contrary to Plaintiff's assertions, the ALJ's discussion of the medical evidence confirms that she did sufficiently consider "Plaintiff's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; effectiveness of medication and treatment; [and] measures taken by [] Plaintiff to reduce his pain level" (Docket Entry 7 at 10) in evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms. (See Tr. 27-37.) To begin, as shown by the block quote above, the ALJ clearly acknowledged Plaintiff's testimony and other statements concerning "the location, duration, frequency, and intensity of the pain or other symptoms" (Docket Entry 7 at 10). (See Tr. 28.) Moreover, in connection with assessing the severity of Plaintiff's mental impairments, the ALJ noted that, although "[Plaintiff] reported that he needed assistance with most activities of daily living[,] . . . he also testified and reported that he did light housework and took care of his own personal care needs" (Tr. 27 (citing Tr. 265-68); see also Tr. 265 (reporting no problems with self-care), 266 (indicating Plaintiff helps with vacuuming)), and that "[he] can generally care for himself, and he can generally leave the house without problems" (id.).[6]

[6] The Court "must read the ALJ's decision as a whole," Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018), and, thus, can consider the ALJ's earlier discussion of that evidence at steps two and three of the SEP.

Furthermore, in the discussion of the medical evidence of record, the ALJ made the following findings demonstrating that she adequately considered the relevant factors in assessing Plaintiff's subjective symptom reports:

- at an emergency room visit on October 28, 2020, Plaintiff reported "increasing suicidal thoughts and depression in the context of dramatic change in income due to the pandemic[,]" and "that he made statements to his fiancee about suicide, including a plan to shoot himself[,]" but "[Plaintiff] reported that[,] even though he said he was suicidal, he had no intention of acting on it" and, "[o]n examination, he had a mostly normal review of his psychiatric systems, with him being alert, oriented, very pleasant and cooperative[,]" with "organized and coherent thoughts, [] no evidence of tangentiality, disorganization, delusional system, hallucinations, or paranoia[,] . . . good insight and judgment and a better mood[,]" and "[he] was advised to follow up with psychotherapy" but "was not prescribed medications, and no further treatment was recommended" (Tr. 30 (emphasis added) (citing Tr. 362-64));

- "[o]n January 25, 2021, [Plaintiff] presented to the [emergency room] . . . under involuntary commitment by law enforcement for alleged suicidal statements he made to his fiancee[,]" but "the notes indicate that he did not make any threatening statements in the presence of the officer, [ Plaintiff] was calm, polite, and joking with the officer the entire time[,]" and, "[o]n examination, he had a mostly normal review of his systems, with him laughing and joking[,]" and "[h]e was advised to follow up with Daymark Recovery in 1 - 2 days" and "no further treatment was recommended" (id. (emphasis added) (citing Tr. 372-74));

- "[Plaintiff] began receiving psychiatric treatment[,]" but "the notes from August 24, 2021, indicate that he failed to show up for his appointments[ and ] was sent a letter attempting to reach him requesting that he re-engage in treatment

service[,]" but "he failed to respond, and[,] by December 17, 2021, he was discharged from services for failure to re-engage" (Tr. 30-31 (emphasis added) (citing Tr. 407-10));

- "[o]n September 26, 2022, [Plaintiff] presented for examination and reported that a tree fell on him a month prior[,]" and that, "after the accident, he had anger outbursts that were uncharacteristic of him, memory loss, and suicidal ideation" but, "[o]n examination, [although] he had impaired short- and long-term memory, [] otherwise he had a mostly normal review of systems, being alert, oriented, and making good eye contact[,] . . . not appear[ing] to be in distress, and . . . able to answer questions appropriately" along with "a negative [Personal Health Questionnaire-2 ('PHQ-2')] score" (Tr. 31 (emphasis added) (citing Tr. 419-20));[7]

- "[o]n November 4, 2022, [Plaintiff] . . . reported that he felt down or depressed more than half the days, had trouble concentrating[, ] had severe problems getting along with other people and taking care of things at home[, and] . . . anger outbursts" but, "[o]n examination, he continued to have a mostly normal review of systems, with him being alert[ and] oriented [with ] normal mood and affect[,]" and "[he] was only prescribed [q]uetiapine [f]umarate" with "[n]o further treatment [] recommended" (id. (emphasis added) (citing Tr. 510-12));

- "on December 5, 2022, [Plaintiff] reported that he still had outbursts and difficulty in gaining his composure[,]" but "he denied having suicidal ideations and reported that the outbursts were becoming less frequent[,]" and "that he had still not been to Daymark or any other mental health provider due to the fact th[at] only group therapy

[7] "The PHQ-2 is an instrument used for screening for the frequency of depressed mood and anhedonia over the past two weeks." Wallace v. O'Malley, No. 2:22CV22, 2024 WL 209185, at *3 n.5 (W.D. Va. Jan. 16, 2024) (unpublished), recommendation adopted, 2024 WL 1255476 (W.D. Va. Mar. 25, 2024) (unpublished). "A PHQ-2 score ranges from zero to six[,]" and a "score [of] three or greater[ predicts] major depressive disorder [a]s likely." Id.

was available at the time[,] . . . and he was again advised to make an appointment with Daymark" and "no further treatment was recommended" (id. (emphasis added) (citing Tr. 513-15));

- at mental health treatment with Daymark on April 19, 2023, Plaintiff "reported being depressed[, ] having anger[, and] . . . hearing voices[,]" but "he was alert, oriented[, ] denied having suicidal or homicidal ideations, did not report having delusions[,] . . . had normal thought content, normal appearance and he was cooperative[, and] was advised to continue therapy" with "no further treatment [] recommended" and, "by June 21, 2023, [] reported that his mood was lighter and leveling out . . . and continued to deny having paranoia, hallucinations, [and] suicidal or homicidal ideations" (Tr. 33 (emphasis added) (citing Tr. 756, 761, 764, 783));

- "on July 31, 2023, [Plaintiff] reported that he had poor sleep, depression, lower back pain[, ] memory issues[,] . . . [and] difficulties with simple math, and [that] he was walking with a cane due to pain[,]" but "he continued to deny having suicidal or homicidal ideations[,]" "did not appear to be in acute distress[,] . . . had normal mood and affect, good insight and judgment and he was comfortable[,]" and "[he] was prescribed Mobic and Voltaren gel" and "offered a muscle relaxer but declined it due to potential sedative side effects" with "no further treatment [] recommended" (Tr. 34 (emphasis added) (citing Tr. 523-24));

- at follow up visits with Daymark in September and October 2023, although Plaintiff reported continued "anger outburst[s]" and "daily yelling[,]" he denied having suicidal or homicidal ideations, [and] auditory or visual hallucinations[,]" and "he was advised to start anger management" with "no further treatment [] recommended" (id. (emphasis added) (citing Tr. 792, 794, 797, 799)).

The language emphasized above makes clear that the ALJ did consider Plaintiff's subjective statements to medical providers regarding

his symptoms, the extent of the treatment he received, and his response to that treatment. (See Tr. 27-37.)

Moreover, in assessing the persuasiveness of the medical opinions of record, the ALJ made further findings supporting her analysis of Plaintiff's subjective symptom reports. See SSR 16-3p, 2017 WL 5180304, at *6 (requiring ALJs to consider medical source "diagnoses, prognoses, and opinions as well as statements and medical reports about [a claimant]'s history, treatment, responses to treatment, . . . and other information concerning the intensity, persistence, and limiting effects of [the claimant]'s symptoms" (emphasis added)). In that regard, the ALJ noted that, although "[Plaintiff] had a treatment history for his physical impairments that would support finding those impairments as severe, . . . [he] was treated with medications[,] . . . no further treatment was recommended or required[,] . . . he routinely had a mostly normal review of his musculoskeletal systems on examination, with normal sensation, intact cranial nerves, normal strength, and normal motor findings[, and] . . . his imaging results mostly showed no major abnormalities." (Tr. 35 (citing Tr. 484, 486, 707, 716) (internal parenthetical citations omitted).) Concerning Plaintiff's mental impairments, the ALJ noted that, although "[Plaintiff] ha[d] diagnoses and a treatment history for his mental impairments that would support finding those impairments as severe, . . . [and] he received therapy and medication management for his psychiatric

symptoms[,] . . . he had not been recently hospitalized for mental conditions[,] . . . he received inconsistent treatment for his psychiatric symptoms[,] . . . he had a history of noncompliance and not following up with treatment advice, [] he was discharged from treatment [for] failing to engage in services[, h]e only recently started receiving consistent treatment of therapy and medication management for his symptoms[,] . . . he routinely had a mostly normal review of his psychiatric systems on examination, with normal mood and affect, [] he routinely denied experiencing hallucinations, delusions, [and] suicidal or homicidal ideations[, and] . . . [he] at times reported that medications helped and improved his symptoms." (Tr. 35-36 (citing Tr. 408, 411, 490, 492, 761, 783, 800) (internal parenthetical citations omitted).) These additional findings further underscore the ALJ's compliance with the applicable regulations and SSR 16-3p in evaluating Plaintiff's subjective symptom reports.

Additionally, Plaintiff's reliance on evidence he believes supports greater limitations in the RFC (see Docket Entry 7 at 11-12 (citing Tr. 366, 372, 417, 420, 473, 476, 485, 487-88, 491, 494, 504, 519, 761, 775, 777, 780, 784, 794)) misinterprets this Court's standard of review. The Court must determine whether the ALJ supported her analysis of Plaintiff's subjective symptom reports with substantial evidence, defined as "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro,

270 F.3d at 176 (brackets and internal quotation marks omitted), and not whether other record evidence weighs against the ALJ's analysis, Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence."). The findings quoted above by the ALJ constitute substantial evidence to support the ALJ's assessment of Plaintiff's subjective symptom reports, regardless of the presence of some evidence that might weigh against the ALJ's assessment.

Moreover, the ALJ did discuss most of the evidence on which Plaintiff relies (see Tr. 29-34), and, thus, Plaintiff's argument amounts to an impermissible request for the Court to reweigh that evidence, see Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) ("In reviewing for substantial evidence, [a court] do[es] not undertake to reweigh conflicting evidence . . . .").[8] Moreover, as

---

[8] Plaintiff maintains that "Dr. [J. Craig] Hunt's [consultative] psychological evaluation concluded that Plaintiff 'demonstrated marked to severe problems with concentration, persistence, and pace,' providing professional validation of [his] debilitating symptoms." (Docket Entry 7 at 14 (citing Tr. 494).) Plaintiff neglects to mention, however, that Dr. Hunt A) noted Plaintiff's "inconsistent motivation and responsiveness to the examination process" (Tr. 491 (emphasis added)), B) concluded that "a gross estimate of [Plaintiff's] intellectual functioning [wa]s problematic" because "[m]any aspects of his response to the mental status examination [we]re highly improbable making it more likely than not his effort did not demonstrate his actual ability" (Tr. 493 (emphasis added), C) found "noteworthy that [Plaintiff's] mental status examination performance [wa]s not consistent with his overall interaction with [Dr. Hunt] during the evaluation process" (id. (emphasis added), D) warned that Dr. Hunt's opinion regarding [Plaintiff's] deficits c[ould not] be offered with

shown by the analysis quoted above, the ALJ's consideration of evidence both supportive of and inconsistent with Plaintiff's disability claim defeats Plaintiff's argument that "the ALJ [] ignored the contrary evidence that supports Plaintiff's testimony" (Docket Entry 7 at 13 (citing Arakas, 983 F.3d at 98)).

Put simply, Plaintiff's first issue on review fails to establish a basis for remand.

**2. Noncompliance with Treatment**

Lastly, Plaintiff contends that "the ALJ committed harmful legal error where she rejected the medical opinions regarding Plaintiff's mental health based on his lack of aggressive treatment but failed to consider the impact of his financial limitations and mental illness on his ability to pursue specialist care." (Id. at 14 (bold font, all-caps font, and block formatting omitted).) More specifically, Plaintiff maintains that "[t]reatment notes indicate that Plaintiff has had financial difficulties affording treatment" (id. at 17), such as an inability "to afford [a] sleep study" (id. (citing Tr. 525)), a need "to file for financial assistance before he could see [neurology and orthopedic] providers" (id. (citing Tr. 529, 800)), and an inability "to obtain refills of his psychotropic medications" (id. at 17-18 (citing Tr. 797)) and "imaging studies"

confidence given the improbable nature of his performance" and that Dr. Hunt's "conclusions [we]re offered with moderate to marked reservation" (id. (emphasis added), and E) opined that "[Plaintiff] demonstrated marked to severe problems with concentration, persistence, and pace based on his mental status response that appear[ed] improbable" (Tr. 494 (emphasis added)).

(id. at 18 (citing Tr. 476)). Plaintiff notes that "the ALJ rejected the [s]tate agency [psychological consultants'] opinions, in large part, due to Plaintiff's 'inconsistent' treatment and 'noncompliance'" (id. at 17 (quoting Tr. 36)), and argues that "[t]he ALJ committed legal error where she did not explicitly discuss Plaintiff's ability to afford recommended treatments even though she referenced his alleged noncompliance" (id. at 18 (citing Keller v. Berryhill, 754 F. App'x 193, 200 (4th Cir. 2018), and Michael C. v. Kijakazi, Civ. No. 22-29, 2022 WL 13945281, at *5 (D. Md. Oct. 24, 2022) (unpublished))). Plaintiff additionally contends that "the ALJ failed to evaluate whether Plaintiff's mental impairments caused some of the 'noncompliance' and lack of aggressive treatment" (id. at 19 (quoting Tr. 36)), and notes that "[c]ourts in th[e Fourth C]ircuit, and others, have recognized that the failure to consider whether a claimant's medication noncompliance is the result of an underlying mental impairments [sic] is error" (id. (citing Jelinek v. Astrue, 662 F.3d 805, 814 (7th Cir. 2011), and Arrington v. Berryhill, No. 0:17CV2612, 2018 WL 7254604, at *4 (D.S.C. Nov. 13, 2018) (unpublished), recommendation adopted, 2019 WL 101767 (D.S.C. Jan. 4, 2019) (unpublished))). As the discussion below makes clear, Plaintiff's arguments miss the mark.

The United States Court of Appeals for the Fourth Circuit has held that "[a] claimant may not be penalized for failing to seek

treatment she cannot afford," because "'[i]t flies in the face of the patent purposes of the . . . Act to deny benefits to someone . . . too poor to obtain medical treatment that may help him.'" Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984)). An administrative ruling further expounds on an ALJ's duties when a claimant alleges an inability to afford treatment as follows:

> . . . [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. [The ALJ] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints. [The ALJ] may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not . . . sought treatment in a manner consistent with his or her complaints. When [the ALJ] consider[s] the individual's treatment history, [the ALJ] may consider (but [is] not limited to) one or more of the following:
>
> . . .
>
> An individual may not be able to afford treatment and may not have access to free or low-cost medical services.
>
> . . .
>
> [An ALJ] will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. [The ALJ] will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them. [The ALJ] will explain how [he or she] considered the

> <u>individual's reasons in [the ALJ's] evaluation of the individual's symptoms</u>.

SSR 16-3p, 2017 WL 5180304, at *9-10 (emphasis added) (bullet omitted).

Here, Plaintiff's arguments falter, because he faults the ALJ for failing to consider Plaintiff's inability to afford treatment such as a "sleep study" (Docket Entry 7 at 17 (citing Tr. 525)) and "imaging studies" (<u>id.</u> at 18 (citing Tr. 476)), as well as his need "to file for financial assistance before he could see [neurology and orthopedic] providers" (<u>id.</u> (citing Tr. 529, 800)). The ALJ, however, did not find Plaintiff "noncompliant" or discount his subjective symptom reports because Plaintiff did not obtain a sleep study, imaging studies, and/or evaluations by neurologists and orthopedists (<u>see</u> Tr. 27-37); rather, the ALJ found the state agency <u>psychological</u> consultants' opinions "partially persuasive" (Tr. 35), in part, because "[Plaintiff] received inconsistent treatment for his <u>psychiatric</u> symptoms[,] . . . he had a history of noncompliance and not following up with treatment advice, and he was discharged from treatment [for] failing to engage in services" (Tr. 36).

Indeed, earlier in the decision, the ALJ noted that "[Plaintiff] began receiving psychiatric treatment[,]" but "the notes from August 24, 2021, indicate that he failed to show up for his appointments[,] . . . was sent a letter attempting to reach him

and requesting that he re-engage in treatment service[,] . . . failed to respond, and by December 17, 2021, [] was discharged from services for failure to re-engage." (Tr. 30-31 (internal parenthetical citation omitted) (citing Tr. 407-10).)[9] The ALJ also noted that A) Plaintiff's providers at the Wilkes Health Department recommended he pursue mental health treatment at Daymark (see Tr. 31 (citing Tr. 420)), but that, "on December 5, 2022, . . . [Plaintiff] stated that he had still not been to Daymark or any other mental health provider due to the fact th[at] only group therapy was available at the time" (id. (emphasis added) (citing Tr. 475)); and B) during Plaintiff's subsequent treatment at Daymark in 2023, his providers advised him on two occasions to start anger management (see Tr. 34 (citing Tr. 794, 799)), but the record does not reflect that Plaintiff followed that advice (see Tr. 794, 799), and no indication exists in the record that financial inability to pay prevented Plaintiff from initiating anger management treatment (see id.).

Plaintiff points out that he "was unable to obtain refills of his psychotropic medications due to financial issues" on one occasion. (Docket Entry 7 at 17-18 (citing Tr. 797).) The ALJ, however, expressly acknowledged that "financial issues" caused

[9] Notably, Plaintiff failed to comply with psychiatric treatment at Daymark in 2021, during a time when Plaintiff worked as a logger. (See Tr. 58-61 (Plaintiff's testimony indicating he last worked as a logger in 2022), 230 (reflecting earnings of $11,349.73 in 2021).)

Plaintiff's inability to refill his prescriptions (Tr. 34 (noting that, "[d]uring an examination on October 18, 2023, . . . [Plaintiff] reported that he ran out of his medications and had been off his Celexa and Depakote for 2 weeks due to financial issues" (emphasis added))). Moreover, the ALJ did not cite to the treatment record reflecting Plaintiff's inability to refill his Celexa and Depakote to support her findings that "[Plaintiff] received inconsistent treatment for his psychiatric symptoms" (Tr. 36 (citing Tr. 411 (Daymark note reflecting Plaintiff's discharge from service for failure to follow-up on December 27, 2021))), or that "he had a history of noncompliance and not following up with treatment advice, and he was discharged from treatment [for] failing to engage in services" (id. (citing Tr. 408 (Daymark note documenting that "[c]linician sent letter to [Plaintiff] requesting [he] re-engage in treatment services"))).

Plaintiff next argues that "the ALJ failed to evaluate whether Plaintiff's mental impairments caused some of the 'noncompliance' and lack of aggressive treatment." (Docket Entry 7 at 19 (quoting Tr. 36).) In Plaintiff's view, "[c]ourts in th[e Fourth C]ircuit, and others, have recognized that the failure to consider whether a claimant's medication noncompliance is the result of an underlying mental impairments [sic] is error." (Id. (citing Jelinek, 662 F.3d at 814, and Arrington, 2018 WL 7254604, at *4).) According to Plaintiff, "the ALJ neither explained, nor even acknowledged, that

Plaintiff's failure to comply with treatment could be a symptom of his mental impairments[, and] . . . erred by discounting the opinion evidence and Plaintiff's subjective testimony on that basis." (Id. at 19-20 (citing Pate-Fires v. Astrue, 564 F.3d 935, 945-46 (8th Cir. 2009)).)

Courts in the Fourth Circuit, including another judge of this Court, have recognized that a claimant's mental impairments can cause noncompliance with recommended treatment, see, e.g., Matthew F. v. Bisignano, No. 1:24CV307, 2025 WL 2784317, at *5 (M.D.N.C. Sept. 30, 2025) (unpublished) (Peake, M.J.) ("[E]ven if there were periods of medication noncompliance, the ALJ never addressed whether [the p]laintiff's non-compliance was (1) a willful act or (2) a manifestation of his mental illness, particularly the paranoia and disordered thinking associated with his schizophrenia. Without this analysis, substantial evidence fails to support the ALJ's decision."); Long v. Kijakazi, No. 7:21CV176, 2023 WL 2338027, at *6 (E.D.N.C. Jan. 10, 2023) (unpublished) (where the plaintiff's mother testified that the plaintiff "inexplicably started taking a half dose of Wellbutrin, which resulted in a manic episode that lasted several months; [] misse[d] doses because he sometimes sle[pt] 18–20 hours a day, and she c[ould not] get him up to take his medication; at times [] refuse[d] to take his medication because he d[id] not believe it work[ed] as the doctor indicated it would; and when . . . manic [] d[id] not comply with

his medications[,]" the court held that "[i]t [wa]s not apparent whether the ALJ considered whether [the plaintiff]'s medication noncompliance was willful or a result of his bipolar disorder, and the ALJ's failure to do so [wa]s error requiring remand"), recommendation adopted, 2023 WL 2333887 (E.D.N.C. Mar. 2, 2023) (unpublished). However, unlike in those cases, the record here contains no such evidence that Plaintiff's mental symptoms caused him to not consistently pursue treatment with Daymark or other mental health providers. (See Tr. 475 (reflecting that Plaintiff had not sought treatment with Daymark because "only group therapy [wa]s available at th[at] time").) Furthermore, no mental health provider opined (or even suggested) that Plaintiff's noncompliance resulted from his mental symptoms (see Tr. 407-10, 417-20, 474-76, 510-30, 756-99), and Plaintiff neither testified at the hearing that his inconsistent psychiatric treatment resulted from his mental symptoms (see Tr. 52-71), nor presented argument through counsel about such matters during the hearing (see Tr. 47-82).

Moreover, Jelinek, Pate-Fires, and Arrington do not aid Plaintiff's cause. In Jelinek and Pate-Fires, the record contained considerable evidence that the plaintiff's mental symptoms caused the noncompliance with treatment. For example, in Jelinek, the court highlighted the following facts supporting its determination that the ALJ erred by failing to consider whether Plaintiff's mental symptoms caused her noncompliance:

> [T]he record shows a litany of changes to [the plaintiff]'s medications over the years, as well as concerns by her doctors over side effects, ineffective drugs, costs, insurance issues, and compliance issues due to both mental illness and the potential lack of family and social support. . . . Treatment notes did not always reflect why medication changes were made, but several notes . . . show that doctors were concerned that [the plaintiff]'s medications were not optimally treating her symptoms and that she would sometimes run out of her medications. These concerns must be addressed as part of any consideration of [the plaintiff]'s failure to comply with prescribed medication.

Jelinek, 662 F.3d at 814 (emphasis added).

Similarly, in Pate-Fires, the court described the following facts supporting its conclusion that the ALJ erred by failing to assess whether the plaintiff's mental impairments played a role in her failure to follow prescribed treatment:

> [T]he evidence overwhelmingly demonstrates [the plaintiff]'s noncompliance was attributable to her mental illness. On December 5, 2002, she was admitted to the State of Tennessee, Western Mental Health Institute on an emergency basis. According to the summary of her psychiatric examination, [the plaintiff] "was in complete denial of illness and judgment was poor . . . . [She] has a lengthy history of noncompliance with medication. She has had recent family conflict, manic behavior and homicidal threats. She has limited insight." Similarly, the treatment notes for her involuntary stay at [Arkansas State Hospital] from December 30, 2003, through January 30, 2004, note her "[j]udgment is poor as evidenced by medication noncompliance" and her "[i]nsight is poor as evidenced by not feeling as if she needs to be at the hospital for treatment."
>
> Further, in his notes from his examination on June 9, 2004, Dr. DeRoeck concluded [the plaintiff] evidences "poor judgment and limited descriptive ability with regard to her discontinued medication — alluding only when pressed to 'not liking the side effects.'" And, in April 2005, when [the plaintiff] was admitted to the

> [Crisis Stabilization Unit], she indicated she stopped taking her medication sometime after her last appointment with Dr. Erby in October of 2004 because "I don't feel like I need them." Following her admission, Dr. Erby evaluated [the plaintiff] and opined her judgment and insight were "[s]ignificantly impaired;" she was suffering from "[v]ague and paranoid delusions;" her intentions about others was guarded; and she exhibited "[i]nappropriate affect."

Pate-Fires, 564 F.3d at 946 (emphasis added) (internal citations omitted).

In contrast, the record here does not contain evidence supporting the notion that Plaintiff's mental impairments caused his noncompliance with psychiatric treatment. For example, none of Plaintiff's mental health providers expressed the kind of concerns described in Jelinek, see Jelinek, 662 F.3d at 814, that Plaintiff's mental conditions caused him to fail to follow up with treatment or to stop taking his medication (see Tr. 362-89, 407-10, 417-20, 474-76, 510-30, 756-99). Indeed, the record reflects that Plaintiff did not seek treatment at Daymark because "only group therapy [wa]s available at th[at] time" (Tr. 475), and ran out of his medications on one occasion because of "financial concerns" (Tr. 797). Moreover, unlike the plaintiff's providers in Pate-Fires, see Pate-Fires, 564 F.3d at 946, Plaintiff's mental providers consistently documented no delusions, paranoia, and auditory or visual hallucinations (see Tr. 364, 373, 476, 491, 515, 780, 783, 787, 789, 792, 797), and did not record statements by Plaintiff to the effect that he did not feel that he needed

psychiatric medication and/or therapy (see Tr. 362-89, 407-10, 417-20, 474-76, 510-30, 756-99; see also Tr. 776 (containing Plaintiff's remark that his psychiatric medications "seem[ed] like they [we]re working"), 792 (reflecting Plaintiff's statement to psychiatric medication provider that Plaintiff felt treatment placed him "on the right track" and that he wanted "to increase his medications")).

Arrington also provides little, if any, support for Plaintiff's arguments. In that case, a new ALJ issued a decision after a remand order by the court and, unlike the prior ALJ, found that the plaintiff's depression and bipolar disorder failed to qualify as severe impairments at step two of the SEP. See Arrington, 2018 WL 7254604, at *4. The court held that, "[e]ven assuming that the ALJ had the authority to reconsider whether [the plaintiff]'s mental impairments of depression and bipolar disorder were actually severe impairments at [s]tep [t]wo of the [SEP], . . . finding th[o]se impairments nonsevere [wa]s not supported by substantial evidence." Id. (emphasis added). In that regard, the court noted that, "[a]lthough the ALJ failed to include any discussion supporting such a finding at [s]tep [t]wo, review of the ALJ's decision as a whole suggests that he found th[o]se impairments to be nonsevere based on . . . medical records suggesting that when [she] was compliant with her medications her symptoms were manageable." Id. (emphasis added). The court

proceeded to find four bases for finding the ALJ's nonseverity finding unsupported by substantial evidence:

> First, . . . when confronted with many of the exact same medicals records, the ALJ who issued the first decision . . . found [the plaintiff]'s depression and bipolar disorder were severe impairments. Second, [the plaintiff]'s mental health records are extensive and span years of treatment documenting the ups and downs of [her] mental impairments. However, the [current] ALJ . . . focuses on periods of improvement without appearing to account that the very nature of [the plaintiff]'s impairments necessarily include symptoms that wax and wane over time. The ALJ also appears to repeatedly weigh heavily the medical records suggesting that when [the plaintiff] was compliant with her medications her symptoms were manageable as a basis for determining that her mental impairments do not interfere with her ability to work and are not severe. However, the ALJ does not appear to have considered that the failure to comply with treatment may represent a symptom of [the plaintiff]'s impairments and therefore may not be a proper consideration in evaluating her credibility. Finally, the ALJ appears to have focused only on aspects of records suggesting that proper administration of medicines alleviated some of [the plaintiff's] issues but did not address records suggesting greater limitations from her mental impairments.

Id. (emphasis added).

Thus, quite apart from the ALJ's reliance on the plaintiff's noncompliance with treatment, the Arrington court found five problems with the ALJ's nonseverity finding, i.e., the ALJ 1) might not have possessed the authority to reconsider the severity of the plaintiff's mental impairments given the scope of the remand order, 2) failed to provide any rationale for his nonseverity finding, 3) found nonseverity counter to the prior ALJ who considered the same evidence, 4) failed to consider the waxing and waning nature of the

plaintiff’s mental symptoms, and 5) cherrypicked the evidence relating to the plaintiff’s mental impairments, see id. Moreover, the court’s use of the words “may” and “may not” when discussing the possibility that the plaintiff’s mental symptoms caused her noncompliance and omission of a discussion of record evidence suggesting that the plaintiff’s mental symptoms caused her noncompliance, see id., further weakens the impact of the court’s holding as support for Plaintiff’s instant contentions.

In sum, Plaintiff’s second and final issue on review fails as a matter of law.

## III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE ORDERED** that the Commissioner’s decision finding no disability is **AFFIRMED**, and that this action is **DISMISSED** with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

September 28, 2026